ORAL ARGUMENT NOT YET SCHEDULED

Case No. 12-5379

# In the United States Court of Appeals
# For the District of Columbia Circuit

---

ERIK AUTOR, ET AL.,

*Appellants,*

v.

REBECCA BLANK, ET AL.,

*Appellees.*

---

On Appeal from the U.S. District Court
for the District of Columbia
Case No. 1:11-cv-01593-ABJ (Jackson, J.)

## BRIEF FOR THE APPELLANT

Charles A. Rothfeld
Joseph P. Minta
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000

*Counsel for Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. ***Parties and Amici.*** The plaintiff-appellants in this case are Erik O. Autor,[*] Nathanael E. Herman, Cass M. Johnson, Stephen E. Lamar, William Reinsch, and Andrew Zamoyski. The defendant-appellees are Rebecca Blank, Acting Secretary of Commerce (in her official capacity), the United States Department of Commerce, Demetrios Marantis, Acting United States Trade Representative (in his official capacity), and the Office of the United States Trade Representative. Pursuant to Fed. R. Civ. P. 25(d), John Bryson was automatically substituted as a defendant for Ms. Blank for a period of time in the district court and Mr. Marantis has been substituted for Ron Kirk in this Court. No amici appeared in the district court and none have yet appeared in this Court.

---

[*] Plaintiff Erik Autor recently left his position with the National Retail Federation, the basis for the advisory committee membership at issue in this case. But because, as the district court held, "if standing can be shown for at least one plaintiff, the Court 'need not consider the standing of the other plaintiffs to raise that claim,'" JA72 (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)), Mr. Autor's changed position does not materially affect this appeal.

2. ***Rulings Under Review.*** The ruling under review is the Order of the U.S. District Court for the District of Columbia (Berman, J.), docketed September 26, 2012, granting defendant-appellees' motion to dismiss for failure to state a claim, and the memorandum decision in support of that Order, reproduced at JA62-93. The memorandum decision does not yet appear in an official reporter, but is reproduced at 2012 WL 4373317.

3. ***Related Cases.*** There are no related cases, and this case has not previously been before this Court or any court other than the U.S. District Court for the District of Columbia.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..................................................................................................i

TABLE OF AUTHORITIES ..................................................................... v

GLOSSARY .......................................................................................ix

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF ISSUES....................................................................... 1

STATEMENT........................................................................................ 1

    A.    Industry Trade Advisory Committees.................................... 3

    B.    The Lobbying Ban ................................................................ 7

    C.    Proceedings Below................................................................ 10

SUMMARY OF THE ARGUMENT ........................................................ 13

STANDARD OF REVIEW..................................................................... 16

ARGUMENT....................................................................................... 17

I.    Plaintiffs Have Adequately Pled A Claim Under The First Amendment. ......................................................................... 19

    A.    ITAC Membership Is A Valuable Government Benefit That May Not Be Conditioned On The Surrender Of First Amendment Rights. ...................................................... 19

    B.    The Lobbying Ban Infringes Plaintiffs' First Amendment Rights. ............................................................. 26

    C.    This Case Is Not Governed By *Knight*. ................................ 36

# TABLE OF CONTENTS
## (continued)

**Page**

II.    The Lobbying Ban Classifies Individuals Based On The
       Exercise Of The Right To Petition...................................................... 41

CONCLUSION ............................................................................................ 42

CERTIFICATE OF COMPLIANCE ......................................................... 43

CERTIFICATE OF FILING AND SERVICE .......................................... 44

STATUTORY ADDENDUM CONTENTS......................................... Add. 1

# <u>TABLE OF AUTHORITIES</u>*

**Page(s)**

**Cases**

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011) ............................................................... 17

*Andersen v. McCotter*,
   100 F.3d 723 (10th Cir. 1996) ........................................................ 25, 26

*Barton v. Clancy*,
   632 F.3d 9 (1st Cir. 2011) ...................................................................... 26

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*,
   518 U.S. 668 (1996) ................................................................................ 19

*Connick v. Myers*,
   461 U.S. 138 (1983) ................................................................................ 18

\* *Cuffley v. Mickes*,
   208 F.3d 702 (8th Cir. 2000) ................................... 22, 23, 24, 25, 40

*Davis v. Federal Election Commission*,
   554 U.S. 724 (2008) ................................................................................ 17

*Dolan v. City of Tigard*,
   512 U.S. 374 (1994) ................................................................................ 18

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ................................................................................ 27

*FCC v. League of Women Voters*,
   468 U.S. 364 (1984) ................................................................. 29, 31, 32

*Foote v. Town of Bedford*,
   642 F.3d 80 (1st Cir. 2011) .................................................................... 25

---

\*  *Authorities upon which we chiefly rely are marked with asterisks.*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Griffith v. Lanier,*
521 F.3d 398 (D.C. Cir. 2008) ............................................................ 25

*Hartman v. Moore,*
547 U.S. 250 (2006) ............................................................................ 17

\* *Hyland v. Wonder,*
972 F.2d 1129 (9th Cir. 1992) .................................... 21, 22, 24, 26, 40

\* *Liberty Lobby, Inc. v. Pearson,*
390 F.2d 489 (D.C. Cir. 1968) ................................................. 18, 21, 28

*Lyng v. Castillo,*
477 U.S. 635 (1986) ............................................................................ 32

*Lyng v. International Union,*
485 U.S. 360 (1988) ............................................................................ 32

*Mem'l Hosp. v. Maricopa Cnty.,*
415 U.S. 250 (1974) ............................................................................ 32

*Minnesota State Board for Community Colleges v. Knight,*
465 U.S. 271 (1984) .................................................................. *passim*

*Mountain States Legal Found. v. Glickman,*
92 F.3d 1228 (D.C. Cir. 1996) ............................................................... i

\* *Perry v. Sindermann,*
408 U.S. 593 (1972) ................................................................. 1, 17, 23

*Pickering v. Board of Education,*
391 U.S. 563 (1968) ............................................................................ 25

*Regan v. Taxation With Representation,*
461 U.S. 540 (1983) .................................................... 29, 30, 31, 32, 33

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
487 U.S. 781 (1988) .................................................................... 21, 28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................................ 17

*Speiser v. Randall*,
    357 U.S. 513 (1958) .............................................................................. 23

*State ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*,
    927 F. Supp. 1248 (E.D. Mo. 1996) .................................................... 23

*United States v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (1995) ........................................................................ 25, 28

*United States v. Whitten*,
    610 F.3d 168 (2d Cir. 2010) ................................................................ 17

*Versarge v. Twp. of Clinton N.J.*,
    984 F.2d 1359 (3d Cir. 1993) ............................................................. 25

## Statutes, Rules and Regulations

2 U.S.C. § 1601 ...................................................................................ix, 2

2 U.S.C. § 1602 ......................................................................................... 8

19 U.S.C. § 2155 ................................................................................... 3, 4

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

Fed. R. Civ. P. 12 ................................................................................. 10

Fed. R. Civ. P. 25 .................................................................................... i

75 Fed. Reg. 24,584 (May 5, 2010) ....................................................... 7

75 Fed. Reg. 35,955 (June 18, 2010) ..................................................... 7

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Miscellaneous**

S. Rep. No. 93-1298, 1974 U.S.C.C.A.N. 7186 (1974) ............................... 4

# GLOSSARY

**ITAC**                    Industry Trade Advisory Committee

**LDA**                     Lobbying Disclosure Act of 1995, 2 U.S.C. § 1601
                            *et seq.*

**Lobbying Ban**            The Executive Branch policy forbidding
                            individuals from serving on Industry Trade
                            Advisory Committees solely because these
                            individuals have exercised their right to petition
                            the government in ways that trigger registration
                            requirements under the Lobbying Disclosure Act.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The district court's order dismissing the complaint was entered on September 26, 2012, and appellants' Notice of Appeal was timely filed on November 26, 2012.

## STATEMENT OF ISSUES

1. Whether it is unconstitutional to prevent individuals from serving on government Industry Trade Advisory Committees because those individuals have engaged in constitutionally protected lobbying activity.

2. Whether differential treatment of individuals based on the amount of constitutionally protected lobbying they do is subject to heightened scrutiny for purposes of equal protection analysis.

## STATEMENT

It is fundamental that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Under this "unconstitutional conditions" doctrine, the government may not condition the award of a desirable benefit on the surrender of a

1

constitutional right.  This case involves a challenge to an Executive Branch policy that imposes just such an unconstitutional condition.

Plaintiffs here engage in lobbying activity and accordingly have registered under the Lobbying Disclosure Act ("LDA"), 2 U.S.C. § 1601 *et seq.*.  All agree that lobbying is a means of petitioning the government that is protected by the First Amendment.  Plaintiffs also have served, or would like to serve, on an Industry Trade Advisory Committee ("ITAC"), a statutorily created mechanism by which persons in the private sector provide advice to the Executive Branch on U.S. trade policy.  But the Executive Branch has adopted a rule (the "Lobbying Ban") that bars any registered lobbyist from serving on an ITAC – a rule that denies an obviously desirable and valuable opportunity to persons simply because they engaged in a specified amount of constitutionally protected lobbying activity.

The district court nevertheless held that this lobbying ban is not constitutionally problematic because it believed that ITAC membership is not really a desirable benefit, or because the ability of some lobbyists to avoid the LDA registration requirement means that not *all* lobbyists are barred from ITAC membership.  But that holding is wrong: the

undeniable fact of the matter is that *these plaintiffs* have been punished simply because they petition the government. The decision below accordingly should be set aside.

### A.    Industry Trade Advisory Committees

ITACs are a long-established mechanism for facilitating communication between the Executive Branch and the private sector. They were established by the Trade Act of 1974, 19 U.S.C. § 2155, which directs the President to "seek information and advice from representative elements of the private sector and non-Federal sector" with respect to aspects of U.S. trade policy. 19 U.S.C. § 2155(a). In particular, ITACs provide advice before, during, and after the negotiation of trade agreements. *See* 19 U.S.C. § 2155(k). Unlike many government advisory committees, ITACs were specifically designed to receive advice from private interests, rather than recommendations of what is in the general public interest. *See* 19 U.S.C. § 2155(a)(1); ITAC, *Become an Advisor – Selection Criteria, available at* http://ita.doc.gov/itac/become_an_advisor/becomeanadvisor.asp#3.

Insofar as is relevant here, ITACs are organized by the United States Trade Representative and the Secretary of Commerce. 19 U.S.C.

3

§ 2155(c)(2).  As the district court explained, ITACs meet at the request of the USTR and other designated officials to provide "policy advice, technical advice and information, and advice on other factors" that bear on specified trade matters.  19 U.S.C. § 2155(d); JA64-65.  Although the USTR is not bound by ITAC advice, it must inform ITAC members of significant departures from ITAC recommendations.    19 U.S.C. § 2155(i).

The ITACs are designed to provide a host of benefits to the government. Through ITACs, government officials are able to obtain advice and input from those "in the best position to assess the effects of removing U.S. and foreign trade barriers on their particular products." S. Rep. No. 93-1298, at 55, *reprinted* at 1974 U.S.C.C.A.N. 7186, 7249 (1974). Composed of experienced industry representatives, ITACs offer the Executive Branch "improv[ed] ... knowledge and familiarity with the problems domestic producers face in obtaining access to foreign markets." *Id.* To ensure that the government receives ITAC members' advice, ITACs are statutorily required to provide reports on proposed trade agreements. *See* 19 U.S.C. § 2155(e)(1).

Unsurprisingly, ITAC membership is a desirable and sought-after status. Although governmental decisionmakers generally need not consult with the general public, consultation with ITACs is *required* before and during trade negotiations. As a necessary condition of the role they play, ITAC members "have access to sensitive business, trade and other information not available to the general public." Gov't Mot. To Dismiss (Dkt. No. 8), at 8. Furthermore, ITAC members "have security clearance and access to certain classified information." *Id.*[1] These individuals both have an opportunity to influence the

---

[1]  ITAC members are forbidden from distributing classified or otherwise non-public information to non-members, even when those non-members work for the same organization as the ITAC member. *See* Industry Trade Advisory Center, *ITAC Operations Manual* at VI.2 (Mar. 2010) ("Consultations with Non-Members"); *see also, e.g.*, Decl. of Assistant USTR Julia Christine Bliss, *Ctr. for Int'l Envtl. Law v. USTR*, No. 1:01-cv-00498-RWR (D.D.C.), Dkt. No. 42-3, ¶ 8 ("It is my judgment that unilateral public release by the United States of any restricted FTAA negotiating documents would ... undermine the ability of the United States to negotiate and conclude the FTAA and other trade and investment agreements on terms favorable to U.S. economic and security interests."); Mark Sinclair, Trans-Pacific Partnership Lead Negotiator, New Zealand, *Draft Confidentiality Letter* (Sept. 2011), *available at* http://www.dfat.gov.au/fta/tpp/111221-tpp-confidentiality-letter.html.

development of government policy and gain valuable experience and expertise in matters of trade negotiation and policy.[2]

That expertise, when paired with ITAC eligibility, also increases ITAC members' employment opportunities. An individual's service on an ITAC brings significant benefits to the organizations he or she represents. By design, ITACs provide these organizations with a unique position from which to educate the government on issues of trade that are important to the organization. When an organization perceives sufficient benefit from ITAC representation, it may choose to hire an individual with the necessary experience in trade policy and law to play that role. Several of the plaintiffs in this case, in addition to their other

---

[2] For instance, it was a cleared advisor with access to confidential draft text who noticed that Russia had not made a firm commitment to join the Information Technology Agreement in its accession application to the World Trade Organization. *See* Inside U.S. Trade, *Tech Industry Presses Administration to Lock in ITA Deal With Russia* (Nov. 4, 2011). Individuals with access only to public materials could not have alerted the Executive Branch to this omission, and absent Advisory Committee input, the agreement could have been signed without the necessary correction.

duties, were employed for such purposes and served on ITACs prior to promulgation of the government policy challenged in this suit.[3]

**B.    The Lobbying Ban**

This case involves a challenge to a federal policy that bars plaintiffs from ITAC membership because they engage in specified lobbying activities ("the Lobbying Ban").  On January 18, 2010, the President directed the heads of all executive departments and agencies to deny appointments or reappointments to advisory committees, such as ITACs, to any individual registered as a lobbyist under the LDA.  *See* 75 Fed. Reg. 35,955 (June 18, 2010). In accordance with this policy, the May 2010 notice soliciting new ITAC members specifically forbade registered lobbyists from being appointed. *See* 75 Fed. Reg. 24,584, 24,585 (May 5, 2010) ("The applicant must not be a federally-registered lobbyist.").

Generally, an individual is required to register under the LDA if the individual (1) is paid by a client for services, (2) makes more than one "lobbying contact" as part of those services, and (3) more than

---

[3] Although plaintiff William Reinsch has not previously served on an ITAC, the Complaint alleges he would do so but for the Lobbying Ban.

twenty per cent of the individual's work for that client over a 3-month period constitutes "lobbying activities."[4]  *See* 2 U.S.C. § 1602(10). With some exceptions, a "lobbying contact" is an oral or written communication to a covered government employee on behalf of a client concerning particular facets of federal legislation, rules, regulations, executive orders, programs, policies, positions, nominations, and confirmations.  2 U.S.C. § 1602(8).  As a consequence, many people who communicated with government officials on matters of policy, including plaintiffs, are barred from serving on an ITAC.

At the same time, the nature of the activity that triggers the LDA registration requirement – which looks to the percentage of activity for a particular client in a given period that an individual devoted to lobbying – makes it possible for some individuals who engage in a significant amount of lobbying nevertheless to avoid having to register under the LDA.  This means that registered lobbyists do not necessarily engage in more lobbying activity than do individuals who are not required to register, as the government acknowledges.  *See* White House

---

[4]  Service on an ITAC is excluded from the definition of a "lobbying contact."

Fact      Sheet,      Feb.      1,      2010,      *available*      *at*
http://www.whitehouse.gov/blog/2010/01/31/lobbyists-rush-hold-
floodgates-open ("The current law also contains a loophole that allows
many lobbyists to avoid registering so long as they keep their actual
lobbying activities to less than 20% of their time working for any
particular client ... .").

       Nevertheless, the impact of the Lobbying Ban has been
significant. As the Complaint alleges, the Lobbying Ban encourages
individuals to structure their work to avoid the twenty per cent LDA
threshold that would trigger registration.  The Complaint further
alleges that many individuals began de-registering as lobbyists around
the time that the Lobbying Ban was being discussed and implemented.
And the Complaint alleges that these de-registrations often did not
wholly reflect a reduction in lobbying activity, but rather followed a
restructuring of an individual's work to remain below the twenty
percent threshold.  As the Complaint also alleges, however, certain
people who are affected by the Lobbying Ban – including plaintiffs here
– are unable to restructure their activities to avoid the LDA registration

requirement. They accordingly have been denied ITAC membership. *See, e.g.*, JA12-13 (¶¶ 7-12).

### C.    Proceedings Below

Plaintiffs here, registered lobbyists who have been or would be denied ITAC membership under the Lobbying Ban, brought this suit to challenge the ban's constitutionality under both the First Amendment and equal protection principles. As set out in the Complaint, plaintiffs' First Amendment claim is straightforward:

> The exclusion of federally registered lobbyists from ITACs substantially burdens First Amendment rights by denying the benefit of committee service to individuals whose exercise of the right to petition triggers the LDA's registration requirement ... .

JA20 (¶ 44). After a hearing and supplemental briefing, the district court granted the government's motion to dismiss the complaint under Fed. R. Civ. Proc. 12(b)(6).[5]

The court initially declared the suit barred by the Supreme Court's decision in *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984), which it regarded as "the case that is most

---

[5]   The district court rejected the government's contention that plaintiffs lack standing.  JA70-74.

analogous to the instant situation." JA74. But the court went on to hold that, "even if *Knight* is not the beginning and end of the matter" (JA76), plaintiffs' First Amendment claim does not satisfy the requirements of the unconstitutional conditions doctrine. That is so, in the district court's view, because service on an ITAC is not "a valuable government benefit that an individual committee member could receive" and, "even if it is, plaintiffs have not been denied that benefit on a basis that infringes upon their constitutionally protected rights and they have not been penalized for or inhibited in the exercise of their rights." JA64.

On the first of these points, the district court recognized the allegation that ITAC service "gives the individual a sense of 'professional satisfaction,' 'valuable expertise,' 'enjoyable experience,' 'valuable experience and education,' 'professional contacts,' and 'the satisfaction of making a contribution.'" JA73. The court also acknowledged that "[t]he Supreme Court has recognized tax exemptions, unemployment benefits, welfare payments, and public employment as valuable government benefits that cannot be withdrawn as a consequence of an individual's exercise of his First Amendment

11

rights." JA77. But the court concluded that the value of ITAC service "is not easily equated to the obvious worth of the governmental benefits that have been recognized by the Supreme Court" in these unconstitutional conditions decisions. JA82.

Alternatively, the district court reasoned that the unconstitutional conditions doctrine is not applicable here because "this case does not involve speech"; the Lobbying Ban does not in any event involve viewpoint discrimination; and "Supreme Court precedent distinguishes between government actions that impose a penalty and those that deny a subsidy," and denial of ITAC membership is more like denial of a subsidy than imposition of a penalty. JA85-86. In addition, the court believed that the Lobbying Ban does not "penalize or inhibit First Amendment expression" because some persons who engage in lobbying are able to structure their activities to avoid the LDA registration requirement and therefore remain eligible for ITAC service. JA88.

Finally, the district court rejected plaintiffs' argument that the distinction drawn by the Lobbying Ban between persons who are and are not eligible for ITAC service is subject to strict equal protection scrutiny because the ban burdens a constitutionally protected interest.

In the court's view, "the policy does *not* distinguish between those who exercise their right to petition the government and those who do not"; "[t]he policy differentiates only between those whose lobbying activities trigger the statutory registration requirement and those whose activities do not." JA89.

Plaintiffs timely appealed. JA94.

## SUMMARY OF THE ARGUMENT

The "unconstitutional conditions" doctrine precludes the government from denying a person a benefit because the person engaged in constitutionally protected activity. That doctrine governs this case. It would seem self-evident that the ability to serve on a government advisory committee is a desirable and beneficial opportunity that many would regard as valuable. And that opportunity is withheld from plaintiffs here solely because they engage in the constitutionally protected activity of petitioning the government, thus both punishing and discouraging that constitutionally protected activity. The district court's reasons for rejecting this conclusion are insupportable.

A.   The district court doubted that the opportunity to serve on an ITAC is a valuable government benefit, the denial of which triggers application of the unconstitutional conditions doctrine.   But that conclusion was wrong.   Courts never have limited application of the doctrine to exclusion from programs that provide quantifiable or pecuniary benefits of the sort demanded by the district court here; courts have, to the contrary, held the doctrine triggered by such things as exclusion from the opportunity to serve as a government volunteer or in an adopt-a-highway program.   The benefits offered by participation in such programs are surely no more tangible or valuable than those provided by the ITAC program at issue in this case.   And the district court failed even to attempt to explain why it is permissible to exclude individuals from such programs simply because they exercised a constitutionally protected right.

B.  Alternatively, the district court believed that the Lobbying Ban does not deny ITAC membership on a basis that impairs plaintiffs' right to petition.   But the court's varying rationales for this conclusion do not withstand scrutiny:

14

*First*, it is immaterial that this case does not involve restrictions on speech, as the district court observed; the right to petition is entitled to equivalent protection under the First Amendment.

*Second*, it also is beside the point that the Lobbying Ban does not discriminate on the basis of viewpoint; the Supreme Court has flatly rejected the assertion that the unconstitutional conditions doctrine is inapplicable when the challenged conditions do not effectuate viewpoint discrimination.

*Third*, the district court erred in believing that the Lobbying Ban may be upheld on the ground that it simply denied plaintiffs a "subsidy." The decisions cited by the district court for this proposition in fact turned, not on the nature of the plaintiffs' benefit as a subsidy, but on the finding that the challenged rule did not have a coercive effect – a finding that was not, and could not be, made here. And even if that were not so, membership on an advisory committee can hardly be equated with a monetary subsidy.

*Fourth*, the Lobbying Ban plainly inhibits petitioning even though some lobbyists have been able to circumvent registration under the LDA by restructuring their lobbying activities; absolutely nothing in the

15

Complaint supports the district court's evident belief that *these plaintiffs* – who in fact were excluded from ITAC service because of the ban – are able to avoid LDA registration and the effects of the ban.

C.  The district court was incorrect in its view that this case is controlled by *Knight*.  That decision was neither argued nor decided under the unconstitutional conditions doctrine.  The Supreme Court's holding, instead, was that individuals may not compel the government to listen to their views.  But plaintiffs do not assert a right to serve on an ITAC; they argue only that they may not be excluded from ITAC service for an unconstitutional reason.  *Knight* has no bearing on that claim.

D.  The district court also erred in its rejection of plaintiffs' equal protection claim.  Its holding that plaintiffs' challenge is subject to rational basis review turned on its conclusion that the Lobbying Ban does not draw distinctions on the basis of constitutionally protected activity.  For the reasons already explained, that conclusion was wrong.

## STANDARD OF REVIEW

"In reviewing the district court's grant of a motion to dismiss," the Court must "accept as true the factual allegations of the plaintiffs'

complaint and review the district court's legal conclusions de novo." *Ali v. Rumsfeld*, 649 F.3d 762, 769 (D.C. Cir. 2011).

## ARGUMENT

This case is resolved by straightforward application of settled law. As both the Supreme Court and this Court have held repeatedly, "[u]nder the 'unconstitutional conditions doctrine,' the government may not do indirectly what it cannot do directly." *United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010) (internal quotation marks omitted). *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006). In the doctrine's classic formulation,

> even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972). *See, e.g., Davis v. FEC*, 554 U.S. 724, 739 (2008) (striking down a statute because it "require[d] a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech 'offends the Constitution [because] it

17

threatens to inhibit exercise of the protected right.'"); *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) ("Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property."); *Connick v. Myers*, 461 U.S. 138, 142 (1983) ("[I]t has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.").

On the face of it, the unconstitutional conditions doctrine would seem to govern in this case. On the one hand, lobbying – which is to say, petitioning the government – undoubtedly is activity that is protected by the Constitution: "every person ... trying to persuade Congressional action is exercising the First Amendment right of petition." *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1968) (Burger, J.). On the other hand, the ability to serve on an ITAC certainly appears to be a valuable government benefit. As a consequence, the Lobbying Ban, which withholds this benefit from

plaintiffs solely *because* they petition the government too frequently, cannot be squared with the principle "that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected [rights] even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996) (internal quotation marks omitted).

In nevertheless rejecting plaintiffs' claim, the district court offered a hodge-podge of rationales: that ITAC membership, although obviously desirable, is not really a "government benefit"; that lobbying is not deserving of the same constitutional protection as is speech; that, in any event, not all people who engage in lobbying are barred from ITAC membership; that plaintiffs' claim is barred by the Supreme Court's decision in *Knight*. On examination, none of these theories has merit.

## I. Plaintiffs Have Adequately Pled A Claim Under The First Amendment.

### A. ITAC Membership Is A Valuable Government Benefit That May Not Be Conditioned On The Surrender Of First Amendment Rights.

The district court's initial ground for denying relief was its view that the opportunity to serve on an ITAC is not "a valuable government benefit." JA77. The court recognized "that service on an ITAC gives the

19

individual a sense of 'professional satisfaction,' 'valuable expertise,' 'enjoyable experience,' 'valuable experience and education,' 'professional contacts,' and 'the satisfaction of making a contribution.'"    JA73 (citations omitted).   But it believed "the precedent is clear that the benefit must be in some way 'valuable'" (JA77-78); that ITAC membership does not have "economic consequences for the member, in the way that jobs, tax exemptions, unemployment benefits, or welfare payments confer clear economic benefits on the recipient" (JA81); and that "even if ITAC service is desirable because it burnishes a member's professional credentials and fattens his or her rolodex (or today, his 'Contacts'), the value of that opportunity is not easily equated to the obvious worth of the governmental benefits that have been recognized by the Supreme Court."  JA82.[6]

---

[6]  The district court's discussion is at many points dismissive both of the role of lobbyists and of plaintiffs' interest in serving on an ITAC. *See, e.g.,* JA24 ("even if the cases plaintiffs cite compel the conclusion that feeling good about one's special access to the corridors of power elevates ITAC membership to the status of a valuable government benefit …"); JA25 (denial of ITAC membership "may make it more difficult for plaintiffs to make the kind of contacts within the government that could improve their effectiveness as lobbyists and it may deny them the opportunity to tout those connections and enhance their business generation").  This view understates the value of ITAC

The district court, however, failed to explain why that is so, or why its distinction has any bearing on application of the unconstitutional conditions doctrine. Although the Supreme Court has never precisely defined the sort of benefit that triggers application of the doctrine, the contours of the rule are defined by the controlling principle: the government may not pressure individuals to surrender their constitutional rights. And looking to that understanding, so far as we are aware, courts never have limited application of the unconstitutional conditions doctrine to exclusion from programs that provide quantifiable or pecuniary benefits of the sort demanded by the district court here.

Thus, the Ninth Circuit in *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992), held that "the opportunity to serve as a *volunteer* constitutes the type of governmental benefit or privilege the deprivation of which

membership, which goes well beyond "feeling good about one's special access to the corridors of power." And if the district court meant that a lobbyist is entitled to lesser protection because he or she petitions on behalf of third parties, the court was incorrect: "a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988); *see also Liberty Lobby,* 390 F.2d at 491 (Burger, J.) ("[E]very person ... trying to persuade Congressional action is exercising the First Amendment right of petition.").

can trigger First Amendment scrutiny." *Id.* at 1135 (emphasis added). As the court explained, "[t]he injury to position or privilege necessary to activate the First Amendment ... need not rise to the level of lost employment. Retaliatory actions with less momentous consequences, such as loss of a volunteer position, are equally egregious in the eyes of the Constitution because a person is being punished for engaging in protected speech." *Id.* The court continued: "[A]s a government volunteer, a person gains valuable experience and education in public administration and can make professional contacts. ... The opportunity to serve as a volunteer is also important because it provides an individual the satisfaction of making a contribution, or giving something back, to society." *Id.* at 1135-36. Accordingly, the court held, volunteer status "is a valuable governmental benefit or privilege that may not be denied on the basis of constitutionally protected speech." *Id.* at 1136.

Similarly, in *Cuffley v. Mickes*, 208 F.3d 702 (8th Cir. 2000), the Eighth Circuit held that an applicant could not be denied the opportunity to participate in a state adopt-a-highway program because he had engaged in disfavored speech. Like the ITAC program, the

adopt-a-highway regime was "a voluntary program" in which private participants provided assistance to the government; it was created "to promote litter control and reduce the costs of litter abatement to the [state]." *State ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 927 F. Supp. 1248, 1251-52 (E.D. Mo. 1996), *rev'd*, 112 F.3d 1332 (8th Cir. 1997). Aside from the satisfaction of service, the only benefit that the program provided participants was reputational, in the form of a roadside sign "acknowledging the identity of the group providing the work." *Id.* at 1252. Yet the Eighth Circuit had no difficulty concluding that the unconstitutional conditions doctrine applied, notwithstanding the absence of any tangible or quantifiable government benefit provided to participants; indeed, the court emphasized that the "'unconstitutional conditions' doctrine is not limited to valuable government benefits or even benefits at all." *Cuffley*, 208 F.3d at 707 n.5. Rather, the purpose of the doctrine is simply to prohibit "the government [from] 'produc[ing] a result which [it] could not command directly.'" *Id.* at 707 (quoting *Perry*, 408 U.S. at 597), in turn quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

The "benefits" at issue in *Cuffley* and *Hyland* were identical in principle to those offered by the ITAC program in this case. ITAC members, like participants in the programs addressed in *Cuffley* and *Hyland*, offer services or advice to the government, obtaining in return personally valuable but not easily quantifiable benefits, including "valuable experience and education," "professional contacts," and "the satisfaction of making a contribution." *Hyland*, 972 F.2d at 1135-36. *Compare* JA16 (¶ 26), 20 (¶ 45), 21 (¶ 49) (describing the nature of ITAC service). And there is no serious doubt that denial of membership on ITACs and other government advisory committees is sufficiently consequential that the threat of exclusion may induce individuals to curtail their constitutionally protected right to petition; in fact, the prospect of exclusion demonstrably *has had* just that effect, with more than 1600 persons de-registering under the LDA in 2009 alone in response to the Administration's announcement of the Lobbying Ban. JA19 (¶ 39).[7] In such circumstances, the unconstitutional conditions doctrine applies.[8]

---

[7] Plaintiffs would prove that a significant number of these de-registrations involved ITAC members. *See* Kevin Bogardus & Rachel

In choosing to disregard these holdings, the district court pointed to immaterial factual distinctions between this case and the appellate decisions on which we rely. *See* JA83-84.[9] But its own discussion of the case law belies its conclusion. *See* JA84 (noting the Tenth Circuit's

---

Leven, "Lobbyists Decertify After Obama Ban," *The Hill* (Feb. 17, 2012) ("[A]t least 22 of the panels' more than 300 members canceled their lobbyist registrations after the White House policy was announced.").

[8]  This Court has not yet decided the distinct question whether the doctrine of *Pickering v. Board of Education*, 391 U.S. 563 (1968), which addresses the circumstances in which the government may limit expressive activity by government employees, applies to volunteers. *See Griffith v. Lanier*, 521 F.3d 398, 400 (D.C. Cir. 2008) ("we assume *arguendo* that [plaintiffs] have a sufficient interest in their volunteer positions to be protected against speech-related dismissal"); *see also Foote v. Town of Bedford*, 642 F.3d 80, 85 (1st Cir. 2011) (applying *Pickering* to volunteer); *Andersen v. McCotter*, 100 F.3d 723, 727-28 (10th Cir. 1996) (applying *Pickering* to intern). Although some courts have concluded that at-will volunteers lack a due process *property* right in their positions (s*ee, e.g., Griffith*, 521 F.3d at 404; *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993)), plaintiffs here have not alleged a due process claim.

[9]  For example, the district court observed that *Cuffley* "involved viewpoint suppression." JA80 n.5; *see also* JA86 n.11. But the Eighth Circuit did not hinge application of the unconstitutional conditions doctrine on that consideration. It could not have: the Supreme Court has made clear that the doctrine applies with full force even to restrictions that "neither prohibit[] any speech nor discriminate[] among speakers based on the content or viewpoint of their messages," so long as the restrictions "impose[] a significant burden on expressive activity" or "induce[] [persons] to curtail their expression." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468-69 (1995).

25

observation in *Anderson v. McCotter*, 100 F.3d 723, 727 (10th Cir. 1996), "that even if the court considered the plaintiff to be a nonpaid volunteer, she would still be entitled to First Amendment protection"); *id* n.9 (noting the First Circuit's observation in *Barton v. Clancy*, 632 F.3d 9, 25-26 (1st Cir. 2011), that "no court has held that volunteers are not protected by the First Amendment"); *id*. n.10 (noting the Ninth Circuit's observation in *Hyland*, 972 F.2d at 1135-36, that "'as a government volunteer, a person gains valuable experience and education in public administration[,] can make professional contacts, and gains the satisfaction of making a contribution to society'"). And most fundamentally, the district court was unable – indeed, did not even attempt – to explain *why* it is permissible for the government to condition participation in a federal program on surrender of First Amendment rights.

### B. The Lobbying Ban Infringes Plaintiffs' First Amendment Rights.

The district court also denied plaintiffs' claim because, apart from the question whether ITAC membership is a "benefit" in the relevant sense, the court believed that the Lobbying Ban does not deny ITAC membership on a basis that infringes plaintiffs' First Amendment right

to petition.  JA85-89.  Here, too, the court offered a disparate set of rationales:  that this case does not involve speech; that the Lobbying Ban does not discriminate on the basis of viewpoint; that the ban denied a "subsidy" rather than a benefit; and that the Lobbying Ban has no constitutional implications because plaintiffs may continue to lobby so long as they do not trigger the LDA registration requirement.  But here, too, each element of this analysis is incorrect.

1.  To begin with, that "this case does not involve speech" (JA85) is utterly beside the point.  The First Amendment protects the right of the people ... to petition the Government for a redress of grievances" and, as we have explained, lobbying is a quintessential form of the exercise of the right to petition.  "In a representative democracy ... [the] government act[s] on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives."  *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961).  Even though "the term 'lobbyist' has become encrusted with invidious connotations, every person ... trying to persuade Congressional action is exercising the First Amendment right of

27

petition." *Liberty Lobby*, 390 F.2d at 491; *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) ("[A] speaker is no less a speaker because he or she is paid to speak."). We are not aware of any decision of any court indicating that the right of petition is deserving of less protection, or is less protected by the unconstitutional conditions doctrine, than is the right to speak. The district court's suggestion to the contrary here is insupportable.

2. The district court also was incorrect in its belief that the unconstitutional conditions doctrine is inapplicable here because the Lobbying Ban does not discriminate on the basis of content. As we have explained (at 24-25 n.12, *supra*), the doctrine fully applies to restrictions that "neither prohibit[] any speech nor discriminate[] among speakers based on the content or viewpoint of their messages," so long as the restrictions "impose[] a significant burden on expressive activity" or "induce[] [persons] to curtail their expression." *Nat'l Treasury Emps. Union*, 513 U.S. at 468-69. It therefore is immaterial, even if true, that plaintiffs were not denied ITAC membership "because

28

of the content of anything they expressed, who they lobbied for, or any particular position they advanced on behalf of their clients."  JA86. [10]

  3. The district court also erred by pointing to a distinction "between government actions that impose a penalty and those that deny a subsidy," which the court invoked in support of the conclusion that "the government is not required to help plaintiffs 'realize all the advantages' of their lobbying activity" and "that the First Amendment does not require the government to, in effect, underwrite plaintiffs' petitioning activity" by allowing them to serve on an ITAC.  JA86, 87. For two reasons, the authority invoked by the court, *Regan v. Taxation*

---

[10] In fact, it is not entirely correct to say that plaintiffs have not been punished because of "who they lobbied for" or that they were not punished "for engaging in particular acts of constitutionally protected expression."  JA86.  The LDA registration requirement, and thus the Lobbying Ban, is triggered by lobbying contacts – defined as communications regarding specific subjects – that take up a specified portion of an individual's work for individual clients.  While not viewpoint-based, these distinctions do differentiate on the basis of content (communications must be scrutinized to determine whether they qualify as defined "lobbying contacts") and who is the beneficiary of the lobbying (the registration requirement is triggered only if the amount of lobbying for an individual or client crosses the specified threshold).  A content-based restriction of this sort, even though it does not discriminate on the basis of viewpoint, is subject to strict scrutiny. *See FCC v. League of Women Voters*, 468 U.S. 364, 375-76 (1984).

*With Representation*, 461 U.S. 540 (1983), does not support its conclusion.

    *First*, the decision in *Regan* did not turn wholly on the distinction between imposing a penalty and denying a subsidy. Instead, it was crucial to the outcome in that case that the challenged government rule did not in fact have a coercive effect. *Regan* involved a challenge to a statute that denied tax exempt status to entities that lobby (*see* 461 U.S. at 541-42); the organizational plaintiff's ability to restructure its corporate affairs to avoid being affected by the government's policy played a central role in the Court's determination that denial of the tax exemption was not an unconstitutional condition:

> It appears that [the plaintiff] could still qualify for a tax exemption under § 501(c)(4). It also appears that [the plaintiff] can obtain tax deductible contributions for its non-lobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying.

*Id.* at 544. *See id.* at 545 ("The Code does not deny [the plaintiff] the right to receive deductible contributions to support its nonlobbying activity, nor does it deny [the plaintiff] any independent benefit on account of its intention to lobby.").

The point is proved by the concurring opinion of Justice Blackmun, who (along with Justices Brennan and Marshall) joined the majority and added: "If viewed in isolation, the lobbying restriction . . . violates the principle, reaffirmed today, *ante,* [461 U.S. at 545], 'that the Government may not deny a benefit to a person because he exercises a constitutional right.' … Because lobbying is protected by the First Amendment, [*E. R.R. Presidents Conference*], § 501(c)(3) therefore denies a significant benefit to organizations choosing to exercise their constitutional rights." *Regan*, 461 U.S. at 552 (Blackmun, J., concurring). But, Justice Blackmun continued, "[t]he constitutional defect that would inhere in § 501(c)(3) alone is avoided by § 501(c)(4). As the Court notes, *ante,* [461 U.S. at 545], [the plaintiff] may use its present § 501(c)(3) organization for its nonlobbying activities and may create a § 501(c)(4) affiliate to pursue its charitable goals through lobbying." *Id.*

And the point is confirmed by *League of Women Voters*, where the court struck down as an unconstitutional condition a program that denied federal funds to broadcasting stations that engaged in editorializing. The Court distinguished *Regan*, not on the ground that

31

*Regan* involved a "subsidy," but because the plaintiff in *Regan* had a ready means to avoid the coercive effect of the government policy by restructuring its operations:  "[I]n contrast to the appellee in *Taxation With Representation*, such a station is not able to segregate its activities according to the source of its funding." *League of Women Voters,* 486 U.S. at 400.  *See also Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 257 (1974) (examining whether policy would "deter" exercise of the right to travel interstate).[11]  That distinction must be the controlling one; the district court here made no attempt to explain *why* ITAC membership should be regarded as an unprotected "subsidy" but "one's job, unemployment benefits, welfare payments, or tax exemptions" – which the district court understood to *be* protected "government benefits" in the relevant sense (*see* JA82) – should not.

_____

[11] Similarly, in *Lyng v. International Union*, 485 U.S. 360 (1988), also cited by the district court (JA86-87), the Supreme Court held the unconstitutional conditions doctrine inapplicable because the challenged policy – which denied food stamps to striking workers – was insufficiently coercive: "[T]he statute at issue does not 'directly and substantially interfere' with appellees' ability to associate for this purpose" and it is "'exceedingly unlikely' that this statute will prevent individuals from continuing to associate together in unions to promote their lawful objectives." *Lyng*, 485 U.S. at 366, quoting *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

*Second*, even assuming that the district court were correct in its view that the Supreme Court categorically differentiates between subsidies and other forms of government benefits, it placed the Lobbying Ban on the wrong side of the line. To the extent the Supreme Court in *Regan* had such a distinction in mind, it regarded monetary benefits as unique: "Congress has merely refused to pay for the lobbying out of public monies" and "Congress is not required by the First Amendment to subsidize lobbying." 461 U.S. at 545-46. But plaintiffs here do not seek a subsidy for their lobbying activities; ITAC membership cannot meaningfully be equated, as the district court did, with "underwrit[ing] plaintiffs' petitioning activity." JA87. And again, it is not at all apparent why the district court believed that losing one's job, or welfare or unemployment benefits, or a tax exemption, should be regarded as imposition of a "penalty," while exclusion from an ITAC should be deemed denial of a "subsidy."

4. Finally, the district court opined that the Lobbying Ban does not in fact "inhibit First Amendment expression." JA88. That is so, the court believed, because it is possible for some individuals to circumvent registration under the LDA, and thus the Lobbying Ban, by

33

restructuring their lobbying activities; thus, "[t]he complaint makes it clear that the statutory duty to register is not directly correlated with the amount, nature, or content of any lobbyist's protected activity." *Id.* The district court's legal conclusion, however, does not follow from its observation.

It is quite true, as the complaint alleges, that the Lobbying Ban is both over- and under-inclusive; some individuals who engage in a relatively small amount of lobbying in an absolute sense are affected by the ban because they must register under the LDA, while other individuals who engage in more lobbying may be able to structure their activities to avoid the registration requirement. Consequently, some individuals have been able to deregister as lobbyists to avoid the Lobbying Ban, even as they continue to engage in lobbying activity. *See* JA18 (¶ 36), 19 (¶ 39).

But the district court was quite wrong to draw from this observation the further conclusion that *these plaintiffs* are able to avoid the Lobbying Ban and accordingly have not been penalized for the exercise of their First Amendment rights. Absolutely nothing in the complaint supports that factual conclusion. To the contrary, the

complaint states that each of the plaintiffs "was not reappointed" to an ITAC "because he is a federally represented lobbyist" (or, in one case, that the plaintiff's ITAC application will be denied under the Lobbying Ban).  JA12-13 (¶¶ 7-12).  It alleges that, because of lax enforcement of the LDA, the Lobbying Ban "adversely affects individuals such as the Plaintiffs in this case who comply with their legal obligations and register as lobbyists, while failing to capture those who flout the LDA and thus pose the greater threat of corrupting the governmental process."   JA19 (¶ 40).  It states that the ban "places a disproportionate burden on small-business interests and public-interest organizations because these groups cannot afford to replace disqualified lobbyists with additional staff to serve on committees."   JA19-20 (¶ 41).   And it specifically alleges that the ban burdens plaintiffs' First Amendment rights by excluding them from ITAC service as a consequence of their lobbying activity.  JA20-22 (¶¶ 42-49).

On this limited record, and at the motion-to-dismiss stage, the district court had no basis on which to conclude that these plaintiffs could restructure their activities to avoid the Lobbying Ban.  All that is apparent from the allegations of the complaint – indeed, what is

undeniable from those allegations – is that plaintiffs have in fact been penalized as a consequence of their constitutionally protected lobbying activity. For present purposes, it is immaterial that the government might seek to defend the Lobbying ban, after discovery, by attempting to demonstrate that plaintiffs could have circumvented the Lobbying Ban. Because the ban applied here as its drafters intended, to attach adverse consequences to the exercise of constitutionally protected rights, the government's motion to dismiss the complaint should have been denied.

### C.    This Case Is Not Governed By *Knight*.

The district court also suggested at several points that this case is controlled by *Knight*. *See* JA74-76, 84. We respectfully suggest that conclusion rests on a misunderstanding either of *Knight* or of the complaint in this case.

*Knight* involved a constitutional challenge to a state's "exclusive representation" rules with regard to public employee unions. Under Minnesota state law, employees could designate, through majority vote, an "exclusive bargaining agent" to "meet and negotiate" with employers over employment terms and conditions. 465 U.S. at 274. State law also

36

directed employers to "meet and confer" with employees regarding other aspects of employment. *Id.* Once an exclusive bargaining agent was selected, employers were permitted to "meet and negotiate" or "meet and confer" *only* with that agent. *Id.* at 275. Employees who were not members of the public-employee union and who disagreed with their exclusive bargaining agent's positions challenged the law as a violation of the First and Fourteenth Amendments.

*Knight* has no bearing here: the case was neither argued nor decided under the unconstitutional conditions doctrine.  As the Supreme Court explained, the plaintiffs' "principal claim [in *Knight* was] that they ha[d] a right to force officers of the state acting in an official policymaking capacity to listen to them in a particular formal setting." 465 U.S. at 282. The Court stated that claim as the one it meant to address no fewer than ten times in its decision.[12] And it

---

[12] *See Knight*, 465 U.S. at 282 ("Rather, [plaintiffs] claim an entitlement to a government audience for their views."); *id.* ("the claim that government is constitutionally obliged to listen to [plaintiffs]"); *id.* at 283 (plaintiffs "have no constitutional right to force the government to listen to their views"); *id.* ("The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy."); *id.* at 284 ("To recognize a constitutional right to participate directly in government policymaking would work a

rejected that claim because the plaintiffs had "no constitutional right to force the government to listen to their views." *Id.* at 283; *see id.* at 283-87. The Court refused to apply heightened scrutiny to the *Knight* plaintiffs' equal protection claim for the same reason: "The interest of [plaintiffs] that is affected – the interest in a government audience for their policy views – finds no special protection in the Constitution. There being no other reason to invoke heightened scrutiny, the ['rational basis' test applies]." *Id.* at 291.

This holding, however, has no application to the argument in this case. Plaintiffs do *not* claim to have a constitutional right to serve on an ITAC or otherwise make the government listen to their views; our argument, instead, is the very different one that plaintiffs may not be denied ITAC membership because they previously exercised a

revolution in existing government practices."); *id.* at 285 (no right to "require government policymakers to listen or respond to individuals' communications on public issues"); *id.* at 286 (plaintiffs "have no constitutional right as members of the public to a government audience for their policy views"); *id.* (plaintiffs' "status as public employees . . . gives them no special constitutional right to a voice in the making of policy by their government employer"); *id.* at 287 ("[The] Court has never recognized a constitutional right of faculty to participate in policymaking in academic institutions."); *id.* (rights to speak "do not entail any government obligation to listen").

constitutional right. That question was not presented – and, in fact, *could not have arisen* – in *Knight*, because the *Knight* plaintiffs were not offered *any* choice or condition at all. They were categorically excluded from the "meet and confer" process, independent of any constitutional rights they might otherwise have been willing to surrender to gain access to state decision-makers. As a result, the question of the existence of a government benefit never arose in that case.

To be sure, the Court in *Knight* also rejected the plaintiffs' contention that their right to speak was infringed by the union's "refus[al] to appoint them to the 'meet and confer' committees" as retaliation for their disagreement with the union's views. 465 U.S. at 289. But that argument also has no bearing on the issue in this case. As the Court explained, it was the *union*, not the state, that drew the distinction challenged by the *Knight* plaintiffs:

> The state ... seeks to obtain [the union's] views on policy questions, and [the union] has simply chosen representatives who share its views on the issues to be discussed with the state. [The union's] ability to 'retaliate' by not selecting those who dissent from its views no more unconstitutionally inhibits [plaintiffs'] speech

> than voters' power to reject a candidate for office
> inhibits the candidate's speech.

*Id.* The equivalent situation in this case would arise if one of the plaintiffs here contended that his rights had been infringed because ITAC membership must be sponsored by a private business or association and no such entity would sponsor the plaintiff because of his aberrant views on trade policy. Like the claim in *Knight*, such an argument would be a challenge to the government's decision to seek advice only from a limited number of people – and not, as in this case, to the government's exclusion of a person from a program in which he or she otherwise would participate solely *because* that person previously had exercised his or her First Amendment rights.

The plaintiffs' briefs before the Supreme Court in *Knight* accordingly made no mention either of the unconstitutional conditions doctrine as such or of the decisions applying the doctrine. And the courts that resolved *Cuffley* and *Hyland* in the years after *Knight* was decided evidently did not regard *Knight* as relevant, making no mention of the case. As a consequence, the holding in *Knight* has no bearing here.

## II. The Lobbying Ban Classifies Individuals Based On The Exercise Of The Right To Petition.

For the same reason that the district court erred in dismissing plaintiffs' First Amendment claim, it was incorrect to reject the Equal Protection claim. To apply rational basis analysis to the Lobbying Ban, the district court first concluded that "the government's policy has no substantial impact on any fundamental interest." JA89. This was not because the district court doubted that petitioning the government is a fundamental right, but because the court concluded that the Lobbying Ban is unrelated to lobbying activity.

In reaching this conclusion, however, the district court drew an artificial distinction between lobbying activities generally (which unquestionably are protected) and lobbying activities that trigger LDA registration. *See* JA89. Again, however, implicit in this conclusion is the finding that LDA registration is unrelated to First Amendment petitioning activity. The Complaint alleges exactly the opposite. *See* JA10-11 (¶¶ 2, 3, 5). Accordingly, the district court's ruling should be reversed and the case remanded for an adjudication under heightened scrutiny.

## CONCLUSION

The district court's order dismissing plaintiffs' complaint for failure to state a claim should be reversed.

Respectfully submitted,

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld
Joseph P. Minta
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000

*Counsel for Appellants*

May 6, 2013

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because it contains 8241 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was been prepared in a proportionately spaced typeface using Microsoft Word 2007 in Century Schoolbook 14-point type for text and footnotes.

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld

*Counsel for Appellants*

43

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 6, 2013, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system and by causing an original and eight copies to be delivered to the Clerk's office. I further certify that two copies were sent via overnight delivery to the following counsel:

Michael S. Raab
Mark B. Stern
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-2000

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld

*Counsel for Appellants*

44

**STATUTORY ADDENDUM**

## STATUTORY ADDENDUM CONTENTS

**Statute**                                                   **Page**

2 U.S.C. § 1602 ........................................................................... 2

2 U.S.C. § 1602 provides:

### § 1602. Definitions

As used in this chapter:

(1) Agency

The term "agency" has the meaning given that term in section 551(1) of Title 5.

(2) Client

The term "client" means any person or entity that employs or retains another person for financial or other compensation to conduct lobbying activities on behalf of that person or entity. A person or entity whose employees act as lobbyists on its own behalf is both a client and an employer of such employees. In the case of a coalition or association that employs or retains other persons to conduct lobbying activities, the client is the coalition or association and not its individual members.

(3) Covered executive branch official

The term "covered executive branch official" means--

**(A)** the President;

**(B)** the Vice President;

**(C)** any officer or employee, or any other individual functioning in the capacity of such an officer or employee, in the Executive Office of the President;

**(D)** any officer or employee serving in a position in level I, II, III, IV, or V of the Executive Schedule, as designated by statute or Executive order;

**(E)** any member of the uniformed services whose pay grade is at or above O-7 under section 201 of Title 37; and

Add. 2

**(F)** any officer or employee serving in a position of a confidential, policy-determining, policy-making, or policy-advocating character described in section 7511(b)(2)(B) of Title 5.

(4) Covered legislative branch official

The term "covered legislative branch official" means--

**(A)** a Member of Congress;

**(B)** an elected officer of either House of Congress;

**(C)** any employee of, or any other individual functioning in the capacity of an employee of--

    **(i)** a Member of Congress;

    **(ii)** a committee of either House of Congress;

    **(iii)** the leadership staff of the House of Representatives or the leadership staff of the Senate;

    **(iv)** a joint committee of Congress; and

    **(v)** a working group or caucus organized to provide legislative services or other assistance to Members of Congress; and

**(D)** any other legislative branch employee serving in a position described under section 109(13) of the Ethics in Government Act of 1978 [5 U.S.C.A. App. 4].

(5) Employee

The term "employee" means any individual who is an officer, employee, partner, director, or proprietor of a person or entity, but does not include--

**(A)** independent contractors; or

Add. 3

**(B)** volunteers who receive no financial or other compensation from the person or entity for their services.

(6) Foreign entity

The term "foreign entity" means a foreign principal (as defined in section 1(b) of the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(b)).

(7) Lobbying activities

The term "lobbying activities" means lobbying contacts and efforts in support of such contacts, including preparation and planning activities, research and other background work that is intended, at the time it is performed, for use in contacts, and coordination with the lobbying activities of others.

(8) Lobbying contact

**(A)** Definition

The term "lobbying contact" means any oral or written communication (including an electronic communication) to a covered executive branch official or a covered legislative branch official that is made on behalf of a client with regard to--

**(i)** the formulation, modification, or adoption of Federal legislation (including legislative proposals);

**(ii)** the formulation, modification, or adoption of a Federal rule, regulation, Executive order, or any other program, policy, or position of the United States Government;

**(iii)** the administration or execution of a Federal program or policy (including the negotiation, award, or administration of a Federal contract, grant, loan, permit, or license); or

**(iv)** the nomination or confirmation of a person for a position subject to confirmation by the Senate.

**(B)** Exceptions

Add. 4

The term "lobbying contact" does not include a communication that is--

    **(i)** made by a public official acting in the public official's official capacity;

    **(ii)** made by a representative of a media organization if the purpose of the communication is gathering and disseminating news and information to the public;

    **(iii)** made in a speech, article, publication or other material that is distributed and made available to the public, or through radio, television, cable television, or other medium of mass communication;

    **(iv)** made on behalf of a government of a foreign country or a foreign political party and disclosed under the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 et seq.);

    **(v)** a request for a meeting, a request for the status of an action, or any other similar administrative request, if the request does not include an attempt to influence a covered executive branch official or a covered legislative branch official;

    **(vi)** made in the course of participation in an advisory committee subject to the Federal Advisory Committee Act;

    **(vii)** testimony given before a committee, subcommittee, or task force of the Congress, or submitted for inclusion in the public record of a hearing conducted by such committee, subcommittee, or task force;

    **(viii)** information provided in writing in response to an oral or written request by a covered executive branch official or a covered legislative branch official for specific information;

    **(ix)** required by subpoena, civil investigative demand, or otherwise compelled by statute, regulation, or other action of the Congress or an agency, including any communication

Add. 5

compelled by a Federal contract, grant, loan, permit, or license;

**(x)** made in response to a notice in the Federal Register, Commerce Business Daily, or other similar publication soliciting communications from the public and directed to the agency official specifically designated in the notice to receive such communications;

**(xi)** not possible to report without disclosing information, the unauthorized disclosure of which is prohibited by law;

**(xii)** made to an official in an agency with regard to--

   **(I)** a judicial proceeding or a criminal or civil law enforcement inquiry, investigation, or proceeding; or

   **(II)** a filing or proceeding that the Government is specifically required by statute or regulation to maintain or conduct on a confidential basis,

if that agency is charged with responsibility for such proceeding, inquiry, investigation, or filing;

**(xiii)** made in compliance with written agency procedures regarding an adjudication conducted by the agency under section 554 of Title 5 or substantially similar provisions;

**(xiv)** a written comment filed in the course of a public proceeding or any other communication that is made on the record in a public proceeding;

**(xv)** a petition for agency action made in writing and required to be a matter of public record pursuant to established agency procedures;

**(xvi)** made on behalf of an individual with regard to that individual's benefits, employment, or other personal matters involving only that individual, except that this clause does not apply to any communication with--

Add. 6

**(I)** a covered executive branch official, or

**(II)** a covered legislative branch official (other than the individual's elected Members of Congress or employees who work under such Members' direct supervision),

with respect to the formulation, modification, or adoption of private legislation for the relief of that individual;

**(xvii)** a disclosure by an individual that is protected under the amendments made by the Whistleblower Protection Act of 1989, under the Inspector General Act of 1978, or under another provision of law;

**(xviii)** made by--

**(I)** a church, its integrated auxiliary, or a convention or association of churches that is exempt from filing a Federal income tax return under paragraph 2 (A)(i) of section 6033(a) of Title 26, or

**(II)** a religious order that is exempt from filing a Federal income tax return under paragraph (2)(A)(iii) of such section 6033(a); and

**(xix)** between--

**(I)** officials of a self-regulatory organization (as defined in section 3(a)(26) of the Securities Exchange Act [15 U.S.C.A. § 78c(a)(26)]) that is registered with or established by the Securities and Exchange Commission as required by that Act [15 U.S.C.A. § 78a et seq.] or a similar organization that is designated by or registered with the Commodities Future Trading Commission as provided under the Commodity Exchange Act [7 U.S.C.A. § 1 et seq.]; and

**(II)** the Securities and Exchange Commission or the Commodities Future Trading Commission, respectively;

relating to the regulatory responsibilities of such organization under that Act.

(9) Lobbying firm

The term "lobbying firm" means a person or entity that has 1 or more employees who are lobbyists on behalf of a client other than that person or entity. The term also includes a self-employed individual who is a lobbyist.

(10) Lobbyist

The term "lobbyist" means any individual who is employed or retained by a client for financial or other compensation for services that include more than one lobbying contact, other than an individual whose lobbying activities constitute less than 20 percent of the time engaged in the services provided by such individual to that client over a 3-month period.

(11) Media organization

The term "media organization" means a person or entity engaged in disseminating information to the general public through a newspaper, magazine, other publication, radio, television, cable television, or other medium of mass communication.

(12) Member of Congress

The term "Member of Congress" means a Senator or a Representative in, or Delegate or Resident Commissioner to, the Congress.

(13) Organization

The term "organization" means a person or entity other than an individual.

(14) Person or entity

The term "person or entity" means any individual, corporation, company, foundation, association, labor organization, firm,

partnership, society, joint stock company, group of organizations, or State or local government.

(15) Public official

The term "public official" means any elected official, appointed official, or employee of--

**(A)** a Federal, State, or local unit of government in the United States other than--

**(i)** a college or university;

**(ii)** a government-sponsored enterprise (as defined in section 622(8) of this title);

**(iii)** a public utility that provides gas, electricity, water, or communications;

**(iv)** a guaranty agency (as defined in section 1085(j) of Title 20), including any affiliate of such an agency; or

**(v)** an agency of any State functioning as a student loan secondary market pursuant to section 1085(d)(1)(F) of Title 20;

**(B)** a Government corporation (as defined in section 9101 of Title 31);

**(C)** an organization of State or local elected or appointed officials other than officials of an entity described in clause (i), (ii), (iii), (iv), or (v) of subparagraph (A);

**(D)** an Indian tribe (as defined in section 450b(e) of Title 25;

**(E)** a national or State political party or any organizational unit thereof; or

**(F)** a national, regional, or local unit of any foreign government, or a group of governments acting together as an international organization.

Add. 9

(16) State

The term "State" means each of the several States, the District of Columbia, and any commonwealth, territory, or possession of the United States.